# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SNOWBALL CAPITAL APPRECIATION FUND, LP, Derivatively and on Behalf of Bed Bath & Beyond, Inc. | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CIVIL ACTION NO. |
| WARREN EISENBERG, LEONARD FEINSTEIN, VICTORIA A. MORRISON, STANLEY R. BARSHAY, ROBERT KAPLAN, DEAN S. ADLER, JORDAN HELLER, KLAUS EPPLER, FRAN STOLLER, STEVEN H. TEMARES, ARTHUR STARK, MATTHEW FIORILLI, EUGENE A. CASTAGNA, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| BED BATH & BEYOND, INC., a New York Corporation | ) ) ) | |
| Nominal Defendant. | ) ) | |
| | ) ) | JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Snowball Capital Appreciation Fund, LP ("Plaintiff" or "Snowball"), derivatively and on behalf of the Nominal Defendant Bed Bath & Beyond, Inc. ("Bed Bath & Beyond" or the "Company"), and for its Verified Derivative Complaint against Defendants herein, allege the following based upon personal knowledge as to itself and its own acts and upon information and

belief as to all other matters, based upon, *inter alia,* the investigation conducted by and under the direction of its attorneys, which investigation included a review of press releases and other public statements made by the Company, its officers and agents, filings by the Nominal Defendant with the United States Securities and Exchange Commission (the "SEC") and publicly available articles and information about Nominal Defendant and its management in the financial and general press and on the Internet.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by Plaintiff for the benefit of Nominal Defendant Bed Bath & Beyond against Defendants who are certain members of the Company's Board of Directors (the "Board") and certain of its executive officers for breaches of their fiduciary duties, unjust enrichment, statutory violations, insider trading and other violations of law.

2.      In gross breach of their fiduciary duties as officers and/or directors of the Individual Defendants colluded with one another to:

a.      improperly backdate grants of stock options to themselves and other employees of Bed Bath & Beyond, in violation of the Company's shareholder approved stock option plans;

b.      improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles;

c.      improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Tax Code;

d.      produce and disseminate to shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

3.      As a result of the Individual Defendants' egregious misconduct, Bed Bath & Beyond has sustained millions of dollars in damages, and the Individual Defendants and the other recipients of the backdated stock options have garnered millions of dollars in unlawful profits.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

5.      Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

6.      Plaintiff Snowball, a citizen of the State of Arkansas, is and was at all relevant times a shareholder of Nominal Defendant Bed Bath & Beyond.

7.      Nominal Defendant Bed Bath & Beyond Inc. is a New York corporation with its corporate headquarters at 650 Liberty Avenue, Union, New Jersey.  According to its public statements the Company is a  nationwide chain of superstores selling predominantly better quality domestics merchandise and home furnishings. The Company has over 725 stores across the country.   The Company's stock is traded on the Nasdaq Global Select Market under the

3

symbol BBBY and is included in the Standard and Poor's 500 Index and the NASDAQ 100 Index.

8.      Defendant Warren Eisenberg is a Co-Founder of the Company and has served as Co-Chairman since 1999. He has served as a Director since 1971. Mr. Eisenberg served as Chairman from 1992 to 1999, and served as Chief Executive Officer or Co-Chief Executive Officer from 1971 to April 2003.  Based on his knowledge of material, non-public information regarding the Company, Mr. Eisenberg violated the securities laws by selling more than 3.6 million shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $143 million.

9.      Leonard Feinstein is a Co-Founder of the Company and has served as Co-Chairman since 1999. He has served as a Director since 1971. Mr. Feinstein served as President from 1992 to 1999, and served as Co-Chief Executive Officer from 1971 to April 2003.  Based on his knowledge of material, non-public information regarding the Company, Mr. Feinstein violated the securities laws by selling more than 4.2 million shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $173 million.

10.      Victoria A. Morrison has been a Director of the Company since 2001.  Ms. Morrison is a member of the Compensation Committee.

11.      Stanley F. Barshay has been a Director of the Company since 2003.  Mr. Brahay is a member of the Compensation Committee.

12.      Robert Kaplan has been a Director of the Company since 1994.  Based on his

knowledge of material, non-public information regarding the Company, Mr. Kaplan violated the securities laws by selling more than 65,000 shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $2.3 million.

13.     Dean S. Adler has been a Director of the Company since 2001.  Mr. Adler is a member of both the Audit Committee and the Compensation Committee.

14.     Jordan Heller has been a Director of the Company since 2003.  Mr. Heller is a member of the Compensation Committee.

15.     Klaus Eppler serves as a Director of the Company and is designated as the Lead Outside Director.

16.     Fran Stoller has been a Director of the Company since 2003.  Ms. Stroller is a member of the Compensation Committee.

17.     Steven H. Temares currently serves as Chief Executive Officer and Director of the Company. Mr. Temares was President and Chief Executive Officer from 2003 to January 2006. Mr. Temares was President and Chief Operating Officer from 1999 to 2003. He has served as Director since January 1999. He was Executive Vice President and Chief Operating Officer from 1997 to 1999.  Based on his knowledge of material, non-public information regarding the Company, Mr. Temares violated the securities laws by selling more than 588,000 shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $21 million.

18.     Arthur Stark currently serves as President and Chief Merchandising Officer of the Company.

19.     Matthew Fiorilli currently serves as Senior Vice President of the Company.

Based on his knowledge of material, non-public information regarding the Company, Mr. Fiorilli violated the securities laws by selling more than 220,000 shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $7.7 million.

20.    Eugene A. Castagna currently serves as Chief Financial Officer and Treasurer of the Company.  Based on his knowledge of material, non-public information regarding the Company, Mr. Castagna violated the securities laws by selling more than 97,000 shares of Bed Bath & Beyond stock, generating insider selling proceeds of more than $4.1 million.

21.    The Defendants identified in ¶¶ 8 - 17 are referred to as the "Director Defendants."   The Defendants identified in ¶¶ 17 - 20 are referred to as "Officer Defendants."  In addition Defendants Alder, Morrison and Stoller are referred to collectively as "Compensation Committee Defendants." Defendants Adler, Barshay and Heller are referred to collectively as "Audit Committee Defendants."  Defendants identified in ¶¶ 8, 9, 12, 17, 19 & 20 are referred to collectively as "Insider Trading Defendants."  Collectively, the Director Defendants, Officer Defendants, Compensation Committee Defendants, Audit Committee Defendants and Insider Trading Defendants are referred to herein as the "Individual Defendants."  Bed Bath & Beyond and the Individual Defendants are collectively referred to herein as "Defendants."

## DUTIES OF INDIVIDUAL DEFENDANTS

22.    The Individual Defendants, through their positions as directors and/or officers of the Company and their receipt of reports, attendance at meetings and access to all of the Company's books, records and other proprietary information, had responsibility for and therefore were in possession of material non-public information concerning the Company and its operations, finances and business prospects.

23. By reason of their positions as officers, directors and/or fiduciaries of Bed Bath & Beyond and because of their ability to control the business and corporate affairs of Bed Bath & Beyond, the Individual Defendants owed Bed Bath & Beyond and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, were and are required to use their utmost ability to control and manage Bed Bath & Beyond in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Bed Bath & Beyond and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

24. Each director and officer of Bed Bath & Beyond owes to the Company the fiduciary duty to exercise due care and diligence in the administration of the affairs of Bed Bath & Beyond and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

25. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations so that the market price of the Company's common stock would be based on truthful and accurate information.

26. The Individual Defendants, because of their positions of control and authority as directors or officers of Bed Bath & Beyond, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Individual Defendants had access to adverse non-public

information about the operations of Bed Bath & Beyond, including, without limitation, the fraud in which the Individual Defendants caused Bed Bath & Beyond to engage.

27.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bed Bath & Beyond, and was at all times acting within the course and scope of said agency.

28.     To discharge their duties, the officers and directors of Bed Bath & Beyond were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of Bed Bath & Beyond. By virtue of such duties, the officers and directors of Bed Bath & Beyond were required, among other things, to:

  a.     manage, conduct, supervise and direct the business affairs of Bed Bath & Beyond in accordance with federal and state law and federal rules and regulations and the charter and bylaws of Bed Bath & Beyond;

  b.     neither violate nor knowingly permit any officer, director, or employee of Bed Bath & Beyond to violate applicable federal laws, rules and regulations and/or state law;

  c.     establish and maintain systematic and accurate books and records of the business and affairs of Bed Bath & Beyond and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of said books and records;

  d.     maintain and implement an adequate and functioning system of internal financial and accounting controls, such that Bed Bath & Beyond's financial statements and information would be accurate;

  e.     exercise reasonable control and supervision over the public statements to the securities markets and trading in Bed Bath & Beyond stock by the officers and employees of Bed Bath & Beyond;

  f.     remain informed as to the status of Bed Bath & Beyond operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to

8

correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws; and

g.   supervise the preparation and filing of any audits, reports or other information required by law from Bed Bath & Beyond and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Bed Bath & Beyond and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

29.    During all relevant times hereto, each of the Individual Defendants occupied positions with Bed Bath & Beyond or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning Bed Bath & Beyond. Because of these positions and such access, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were and are obligated to disclose material adverse information regarding Bed Bath & Beyond and to abstain from trading on such information so as to profit from its misuse.

30.    Notwithstanding their duty to refrain from trading in Bed Bath & Beyond stock while in the possession of material, adverse, non-public information concerning the Company, the Insider Selling Defendants sold more than eight (8) million shares of Bed Bath & Beyond stock at artificially inflated prices for proceeds of more than $350 million, in direct violation of state and federal law.

31.    The Individual Defendants breached their duties of good faith and loyalty by allowing other Individual Defendants to cause or by themselves causing the Company to misrepresent its financial results as detailed herein, or by failing to prevent other Individual Defendants from taking such illegal actions. As a result of the Defendants' illegal actions and

9

course of conduct during all times relevant to this Complaint, Bed Bath & Beyond is now and will likely continue to be the subject of lawsuits which allege violations of the federal securities laws and state laws. As a result, the Company has expended significant sums of money for internal investigations and legal counsel. Additionally, the Company will have to expend significant sums of money to defend this and other actions against the Company resulting from the Defendants' misconduct.

## CONSPIRACY, AIDING AND ABETTING AND CONSERTED ACTION

32.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

33.     During all relevant times hereto, the Individual Defendants initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was allowing its directors and certain officers to divert hundreds of millions of dollars to Bed Bath & Beyond insiders and directors and causing Bed Bath & Beyond to misrepresent its financial results; (ii) maintain the Individual Defendants' executive and directorial positions at Bed Bath & Beyond, and the profits, power and prestige which the Individual Defendants enjoyed as a result of those positions, in spite of these Defendants' violations of law and other fiduciary breaches (as set forth herein); (iii) deceive the investing public, including Plaintiff and the other shareholders of Bed Bath & Beyond, regarding Defendants' management of Bed Bath & Beyond's financial conditions, and Bed Bath & Beyond's future business prospects; and (iv) artificially inflate the

market price of Bed Bath & Beyond securities during all relevant times. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants, and each of them, took the actions as herein set forth.

34.     Each of the Individual Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as detailed herein, to substantially assist in the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Individual Defendants' acts of aiding and abetting include, *inter alia*, the acts each of them is alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

35.     Each of the Individual Defendants, by acting as herein described, did so knowingly or in such an intentional manner as to constitute a breach of fiduciary duty owed to the Company and its shareholders.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

36.     Plaintiff brings this action derivatively in the right and for the benefit of Bed Bath & Beyond to redress injuries suffered, and to be suffered, by Bed Bath & Beyond as a direct result of the breaches of fiduciary duty, violations of law, abuse of control, gross mismanagement and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants. This is not a collusive action to confer jurisdiction of this Court which it would not otherwise have.

37.     Plaintiff will adequately and fairly represent the interests of Bed Bath & Beyond and its shareholders in enforcing and prosecuting its rights.

11

38.     Plaintiff is and was an owner of the stock of Bed Bath & Beyond during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

39.     The present Board of Directors consists of ten members: Defendants Eisenberg, Feinstein, Temares, Adler, Barshay, Eppler, Heller, Kaplan, Morrison and Stoller.  Plaintiff has not made any demand on the present Board of Directors of Bed Bath & Beyond to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons outlined in ¶¶ 40 - 52 below.

40.     Each of the directors of Bed Bath & Beyond authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein.  Because each director is interested and not independent, he or she could not fairly and fully prosecute a suit even if such suit was instituted by them.

41.     The Bed Bath & Beyond Board of Directors and senior officers participated in, approved  and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from Bed Bath & Beyond stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties.  As a result of their access to and review of internal corporate documents, communications with corporate officers and attendance at management and Board meetings, each director of Bed Bath & Beyond had actual or constructive knowledge regarding the improper stock option grants and financial reporting.

42.     As a director of Bed Bath & Beyond, each Board member had and has specific duties he owed to the Company and its shareholders.  In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from Bed Bath & Beyond's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein.   Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subjecting the Company to millions of dollars in liability for potential violations of applicable securities laws.

43.     In total, the Insider Selling Defendants sold 8,859,946 shares of Bed Bath & Beyond stock, receiving $352,751,369.32 in proceeds from these illegal insider sales.  Because each of the Insider Selling Defendants received a substantial personal benefit from the challenged insider sales transactions, these Defendants are interested.  These Defendants face potential liability for breach of their fiduciary duties not to trade shares of Bed Bath & Beyond stock while in possession of adverse material, non-public information.  Four of the six Insider Selling Defendants, Defendants Feinstein, Eisenberg, Temares and Kaplan, are current members of the Bed Bath & Beyond Board of Directors.  Because these Defendants are interested and have breached their fiduciary duties, any demand upon them clearly would be futile.

44.     In order to bring this suit, all of the directors of Bed Bath & Beyond would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

45.     The acts complained of constitute violations of the fiduciary duties owed by Bed Bath & Beyond's officers and directors and these acts are incapable of ratification.

46.     Any suit by the directors of Bed Bath & Beyond to remedy these wrongs would likely expose the Individual Defendants and Bed Bath & Beyond to further violations of the securities laws, which would result in civil actions being filed against one or more of the Individual Defendants and thus they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

47.     Bed Bath & Beyond has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Bed Bath & Beyond any part of the damages the Company suffered and will suffer thereby.

48.     If the Director Defendants were to bring this derivative action against themselves, they would necessarily challenge their own misconduct, which underlies allegations against them contained in class action complaints for violations of federal securities laws, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants.

49.     Each member of the Bed Bath & Beyond Board is, directly or indirectly, the recipient of remuneration paid by the Company, including benefits, stock options and other emoluments by virtue of his or her Board membership and control over the Company, the continuation of which is dependent upon his or her cooperation with the other members of the

14

Board, and his or her participation and acquiescence in the wrongdoing set forth herein, and each member is therefore incapable of exercising independent objective judgment in deciding whether to bring this action. Because of their association as directors of the Company and their positions as present or former employees, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

50.    If Bed Bath & Beyond's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of Bed Bath & Beyond. Due, however, to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by Bed Bath & Beyond against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these Director Defendants were to sue themselves or certain of the officers of Bed Bath & Beyond, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. In the absence of liability insurance coverage, as would occur if a similar suit were filed by the Company itself, the Director Defendant would not cause Bed Bath & Beyond to sue themselves, since they will face a large uninsured liability.

51.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Individual Defendants have failed and refused to seek to recover for Bed Bath & Beyond for any of the wrongdoing alleged by Plaintiff herein.

52.    Plaintiff has not made any demand on shareholders of Bed Bath & Beyond to institute this action since such demand would be a futile and useless act for the following reasons:

a.    Bed Bath & Beyond is a publicly traded company with thousands of holders of record;

b.    Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.    Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could be individually identified.

## FACTUAL ALLEGATIONS

53.    On June 19, 2006, two analyst reports included Bed Bath & Beyond on a list of companies whose options practices were questioned because of the extremely favorable exercise prices. Following these reports the Board of the Company appointed a special committee of two independent members of the Board to conduct an internal investigation into the Company's option grant practices. On June 20, 2006, this special committee retained legal counsel as well as outside accounting advisors and commenced its review in late June 2006. On September 20, 2006, legal counsel to the special committee notified the SEC of its internal investigation. Following this notification, the SEC commenced its own inquiry into the Company's option grant practices.

54.     On October 9, 2006, the special committee completed its review and presented its findings to the Board. The Company then filed its Form 8-K with the SEC which albeit admits, among other things, that the Company has engaged in the backdating of option awards and admits that the Company has internal control deficiencies among other problems specifically enumerated below in ¶¶ 55 - 64.

55.     As a result of the Company's backdating and control deficiencies the special committee has recommended among other things, "that the Company revise the measurement dates under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," for 16 annual option grant dates, 26 monthly grant dates and 2 special grant dates...." As a result of correcting these backdated grant dates the Company's accounting for equity based compensation must also be restated. "The Company has determined that from fiscal year 1993 through the second quarter of fiscal 2006, it had certain unrecorded non-cash equity-based compensation charges associated with its equity-based compensation plans." Therefore the Company will, "in accordance with the transition provisions of Staff Accounting Bulletin No. 108, 'Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in the Current Year Financial Statements,' ("SAB 108"), record a reclassification, within the equity section of the consolidated balance sheet to be included in its Form 10-K for the fiscal year ending March 3, 2007, of approximately $66 million, excluding any related tax effect. The Company has yet to determine the effect its backdating scheme will have on its previous tax filings. This impact, however, is likely to be significant.

56.     During the relevant period, the shareholders of Bed Bath & Beyond had approved the Bed Bath & Beyond, Inc. 2000 Stock Option Plan (the "2000 Plan") and 2001 Stock Option

("2001 Plan") Plans, as well as its most recent plan, the Bed Bath & Beyond, Inc., 2004 Incentive Compensation Plan (the "2004 Plan"). Collectively, the 2000 Plan, the 2001 Plan and the 2004 Plan are referred to as the "Stock Option Plans". All stock options issued during the relevant period were issued pursuant to a shareholder approved plan. At all relevant times the Stock Options Plans governed the granting of stock options. Specifically, the 2000 Plan, which is substantially similar to the 2001 Plan in all relevant respects, stated, in pertinent part that the purpose of the plan is:

> ...to encourage and enable key employees (which term, as used herein, shall include officers), and directors of Bed Bath & Beyond Inc. or a parent (if any) or subsidiaries thereof (collectively, unless the context otherwise requires, the "Company"), consultants, and advisors to the Company, and other persons or entities providing goods or services to the Company to acquire a proprietary interest in the Company through the ownership of common stock of the Company.... Such ownership will provide such employees and Associates with a more direct stake in the future welfare of the Company and encourage them to remain employed by or associated with the Company. It is also expected that the Plan will encourage qualified persons to seek and accept employment or association with the Company.

57.     The 2000 Plan further makes it clear that the exercise price for options granted under the Company's stock option plan were to be granted at fair market value or at 100% of the price per share at the time of the grant. Specifically the 2000 Plan states:

> [t]he exercise price of each option shall be determined by the Committee, provided, **however, that the exercise price per share of Stock shall not be less than 100% (110% for an incentive stock option granted to a greater than ten-percent shareholder) of the fair market value per share of Stock at the time the option is granted, and provided further, that after an option has been granted the exercise price shall not be reduced....** [emphasis added]

* * * * *

18

The fair market value of a share of Stock as of any date shall be determined for purposes of the Plan as follows: (I) if the Stock is listed on a securities exchange or quoted through the National Association of Securities Dealers Automatic Quotation ("NASDAQ") National Market System, the fair market value shall equal the mean between the high and low sales prices on such exchange or through such market system, as the case may be, on such day or in the absence of reported sales on such day, the mean between the reported bid and asked prices on such exchange or through such market system, as the case may be, on such day, (ii) if the Stock is not listed or quoted as described in the preceding clause but is quoted through NASDAQ (but not through the National Market System), the fair market value shall equal the mean between the bid and offered prices as quoted by the National Association of Securities Dealers through NASDAQ for such day and (iii) if the Stock is not listed or quoted on a securities exchange or through NASDAQ, then the fair market value shall be determined by such other method as the Committee determines to be reasonable and consistent with applicable requirements of the Code and the regulations issued thereunder applicable to incentive options; provided, however, that if pursuant to clause (I) or (ii) fair market value is to be determined based upon the mean of bid and asked prices and the Committee determines that such mean does not properly reflect fair market value, then fair market value shall be determined by the Committee as provided in clause (iii).

58.     By an affirmative vote of the shareholders as submitted to them in the May 28, 2004 Proxy Statement, the Company voided all other stock option plans and adopted the 2004 Plan. According to the 2004 Plan, its purpose was "to enhance the profitability and value of the Company for the benefit of its stockholders by enabling the Company to offer Eligible Employees, Consultants and Non-Employee Directors stock-based and other incentives, thereby creating a means to raise the level of equity ownership by such individuals and provide other incentives in order to attract, retain and reward such individuals and strengthen the mutuality of interests between such individuals and the Company's stockholders."

59.     Similar to the 2000 Plan the 2004 Plan makes it abundantly clear that the exercise

price for options granted under the Company's stock option plan were to be granted at fair market value or at 100% of the price per share at the time of the grant.  Specifically the 2004 Plan states, **"[t]he exercise price per share of Common Stock subject to an Option shall be determined by the Committee at the time of grant, provided that the per-share exercise price of any Option shall not be less than 100% of the Fair Market Value of the Common Stock at the time of grant."** [emphasis added].

60.    The 2004 Plan goes on to define "fair market value" as:

> ... the average of the high and low sales prices reported for the Common Stock on the applicable date: (a) as reported on the principal national securities exchange in the United States on which it is then traded; or (b) if not traded on any such national securities exchange, as quoted on an automated quotation system sponsored by the National Association of Securities Dealers, Inc. For purposes of the grant of any Award, the applicable date shall be the date on which the Award is granted, or if the Common Stock shall not have been reported or quoted on such date, on the first day prior thereto on which the Common Stock was reported or quoted. For purposes of the exercise of any Award, the applicable date shall be the date a notice of exercise is received by the Committee or, if not a day on which the applicable market is open, the next day that it is open.

61.    With these shareholder approved stock option plans in effect, the Defendants in total disregard to shareholder approvals and in violation of their fiduciary duties, engaged in a scheme to illegally backdate option grants to themselves and other employees and executives of Bed Bath & Beyond.  It was not until pressure was brought to bear upon the Individual Defendants, did they initiate an internal investigation into their illegal practices.  The findings and recommendations of the Defendants' own internal investigation provides significant insight into their illegal backdating scheme.  The Defendant's report makes the following findings for the period from 1998 through 2005:

- **Five annual grant dates were at the low price for the fiscal quarter** (the special committee determined that there was conclusive or strong evidence that one of these grant dates was selected on the actual date and the others no later than two, three, five and eight trading days after the grant date). [emphasis added].

- **Two additional annual dates were at the low price of the +/- 20 trading days** (the special committee determined that there was conclusive evidence that these dates were selected no later than three and four trading days after the grant date). [emphasis added].

- **One annual grant date was the third lowest for the fiscal quarter** (the special committee determined that there was strong evidence that this date was selected no later than two trading days after the grant date). [emphasis added].

62.     Although the Company's report attempts to down play the significance and fraudulent nature of the illegal backdating by indicating that the Defendants chose dates near the actual grant date in which to price the stock options. Such practices still violated the shareholder approved Stock Option Plans. Whether the dates used to set the exercise price of the stock options were backdated one day from the actual grant or one hundred days from the actual date, the fact remains that the Defendants illegally chose the dates selected to provide maximum profit to the recipients of these options, in violation of the Company's Stock Option Plans. The Defendants recognized the illegal nature of their actions and consequently the special committed concluded that it believes, **"[s]ome hindsight was used in selecting some annual grant dates.** Excluding grants only to Form 4 filers beginning in 2003, **almost all annual grant dates in 1998-2004 likely were selected with some hindsight...."** [emphasis added].

63.     Moreover, in its report to the Board, the special committee further

21

determines that the Company has control problems and internal deficiencies.  Specifically the report states, **"[t]he option granting process had control and other deficiencies.  The Company failed to maintain adequate controls with respect to issuance of options in compliance with the Company's stock option policies; the Company's policies also were not sufficient to ensure compliance with all applicable accounting rules.** [emphasis added].

64.     The special committee further found that the Individual Defendants have filed false and misleading statements with the SEC as a result of their illegal backdating scheme. Specifically the report states, "[w]ith respect to prior SEC disclosure... [t]he Company made disclosure in various SEC filings that option grants were made at fair market value on the date of grant and that no compensation expense was recognized.  **In light of the findings, the disclosures with respect to stock option practices and related accounting were not accurate in certain respects."** [emphasis added].

## STOCK OPTION GRANTS

65.     From 2000 to 2006, either the Compensation Committee or specifically designated committees of the Board were authorized to grant stock options in compliance with the Company's Stock Option Plan in effect at time of issuance.  During the relevant period stock options were granted to the  following directors and officers in the following amounts, purportedly on the following dates and at the corresponding exercise price:

| Officer/Director | Grant Date | Exercise Price | Number of Options |
|---|---|---|---|
| Warren Eisenberg | 3/13/2000 | $22.938 | 300,000 |
|  | 3/30/2001 | $23.782 | 300,000 |
|  | 3/6/2002 | $31.615 | 300,000 |
|  | 4/25/2003 | $38.220 | 400,000 |
|  | 3/3/2004 | $41.350 | 300,000 |
|  | 4/20/2005 | $37.510 | 100,000 |

22

| | | | |
|---|---|---|---|
| Leonard Feinstein | 3/13/2000 | $22.938 | 300,000 |
| | 3/30/2001 | $23.782 | 300,000 |
| | 3/6/2002 | $31.615 | 300,000 |
| | 4/25/2003 | $38.220 | 400,000 |
| | 3/3/2004 | $41.350 | 300,000 |
| | 4/20/2005 | $37.510 | 100,000 |
| Steven H. Temares | 3/13/2000 | $22.938 | 300,000 |
| | 3/30/2001 | $23.782 | 300,000 |
| | 3/6/2002 | $31.615 | 300,000 |
| | 4/25/2003 | $38.220 | 400,000 |
| | 3/3/2004 | $41.350 | 300,000 |
| | 4/20/2005 | $37.510 | 200,000 |
| Arthur Stark | 3/13/2000 | $22.938 | 75,000 |
| | 3/30/2001 | $23.782 | 75,000 |
| | 3/6/2002 | $31.615 | 75,000 |
| | 4/25/2003 | $38.220 | 100,000 |
| | 3/3/2004 | $41.350 | 100,000 |
| | 4/20/2005 | $37.510 | 25,000 |
| Matthew Fiorilli | 3/13/2000 | $22.938 | 75,000 |
| | 3/30/2001 | $23.782 | 75,000 |
| | 3/6/2002 | $31.615 | 75,000 |
| | 4/25/2003 | $38.220 | 100,000 |
| | 3/3/2004 | $41.350 | 100,000 |
| | 4/20/2005 | $37.510 | 25,000 |

66.     On March 13, 2000 the date the Company purportedly granted stock options, the exercise price was $22.93.  However, just ten days before this date Bed Bath & Beyond stock traded at $26.88, and ten days after the March 13, 2000 purported grant the Company's stock price climbed over 28% to $29.44.  Similarly, immediately before March 30, 2001 and the March 6, 2002, purported grants of stock options, Bed Bath & Beyond stocks traded at much higher amounts than it did on the exercise date.  Also, ironically in just a few short days after these purported stock option grants on March 30, 2001 and March 6, 2002, the Company's stock price saw sharp increases.  As concluded by the special committee, it is more than mere luck, but

23

rather, conclusive or strong evidence that the Individual Defendant's engaged in an illegal backdating scheme.

67.     Additionally, while in possession of adverse non public information regarding the Company's true financial condition, the following Insider Selling Defendants participated in illegal insider trading.  The chart below illustrates the sales of the Insider Selling Defendants from December 2001 through October 2006:

| Insider | Shares Sold | Stock Sale Proceeds |
| --- | --- | --- |
| Leonard Feinstein | 4,273,975 | $173,328,269.39 |
| Warren Eisenberg | 3,614,429 | $143,405,941.55 |
| Steven H. Temares | 588,000 | $21,805,052.00 |
| Matthew Fiorilli | 220,000 | $7,700,420.00 |
| Eugene A. Castagna | 97,800 | $4,141,927.80 |
| Robert S. Kaplan | 65,742 | $2,369,758.59 |
| | 8,859,946 | $352,751,369.32 |

## DEFENDANTS BACK-DATED AND OTHERWISE MANIPULATED STOCK OPTIONS

68.     The backdating of stock option grants and the issuance of these options in the amounts awarded to the Individual Defendants causes, and continues to cause, substantial harm to the Company.  Backdating stock option grants represents a direct and continuing waste of valuable corporate assets.  Bed Bath & Beyond is the counter party to the options contracts with the Individual Defendants, and the proceeds obtained, and yet to be obtained, by these Individual Defendants through exercising their backdated stock options are therefore siphoned, on a dollar for dollar basis, directly from Bed Bath & Beyond.  In effect, the backdated grants gave the Individual Defendants an option to purchase Bed Bath & Beyond shares directly from the Company at an unfair and improperly low price, with the Company making up the difference.

24

69.     The practice of backdating stock options also substantially harmed and continues to harm Bed Bath & Beyond by virtue of the fact that the practice is unlawful, deceitful, and caused the Company to publicly misreport its financial data.  Pursuant to APB 25, the applicable GAAP provision at the time of the options grants set forth herein, if the stock's market price on the date of grant exceeds the exercise price of the options, the corporation must recognize the difference as an expense, which directly impacts earnings.  Bed Bath & Beyond did not properly expense this additional compensation to the Individual Defendants even though the backdated stock options at issue in this action were priced below the fair market value of the Company's stock at the date of grant and issuance.  Thus, Bed Bath & Beyond, with the knowledge and participation of the Individual Defendants, violated GAAP.

70.     Similarly, the option backdating likely caused Bed Bath & Beyond to violate the Internal Revenue Code, because compensation from exercised stock options issued under the backdating scheme that was previously deducted, was in fact, nondeductible under Section 162(m) of the Tax Code, 26 U.S.C. § 162(m) ("Section 162 (m)").  Pursuant to Section 162 (m) compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation; and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other

material terms were in fact satisfied. Indeed, by permitting the Defendants to receive stock option grants backdated to correspond to low points in the stock price, the Director Defendants not only ensured that the equity-based long-term compensation was the "most rewarding element" of the Bed Bath & Beyond executive compensation program, but also created an attractive incentive for management to engineer dips and volatile swings in the stock price.

71.    It is now evident that the reason for the pattern documented in the chart above is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, the Individual Defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Bed Bath & Beyond stock was lower than the market price on the actual grant dates.

72.    Complicating matters and magnifying the harm to Bed Bath & Beyond is the fact that during the relevant period, the Company's internal controls and accounting controls with respect to option grants and exercises, and its financial reporting, were grossly inadequate.

73.    As a result of the manipulation of the stock option grant date, the Individual Defendants have been unjustly enriched by many hundreds of millions of dollars at the expense of the Company. The Company has received and will receive far less money when the Individual Defendants exercise their options at prices substantially lower than they would have if the options had not been backdated.

### Dissemination of False and Misleading Financial Statements

74.    As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the Individual Defendants:

a.    violated the terms of the Company's shareholder-approved stock option plans;

b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d.    produced and disseminated to Bed Bath & Beyond's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants.

75.    The Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia,* the following:

a.    Form 10-K for year ended February 25, filed with the SEC on May 12, 2006 and signed by Defendants Temares and Castagna;

b.    Form 10-K for year ended February 26, 2005, filed with the SEC on May 12, 2005 and signed by Defendants Temares and Castagna;

c.    Form 10-K for year ended February 28, 2004, filed with the SEC on May 13, 2004 and signed by Defendants Temares and Castagna;

d.    Form 10-K for year ended March 1, 2003, filed with the SEC on May 29, 2003 and signed by Defendants Temares and Castagna;

e.    Form 10-K for year ended March 2, 2002, filed with the SEC and May 31, 2002 and signed byDefendants Eisenberg, Feinstein and Temares;

f.    Form 10-K for year ended March 3, , 2001, filed with the SEC on May 31, 2001 and signed by Defendants Eisenberg, Feinstein, Temares and Castagna.

76.     Furthermore, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper option backdating:

    a.     disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Officer Defendants; and

    b.     filed with the SEC Form 4 filings that falsely reported the dates of stock option grants to Officer Defendants.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

77.     The Officer Defendants breached their fiduciary duties by:

    a.     colluding with the Audit Committee Defendants and Compensation Committee Defendants to backdate stock option grants;

    b.     colluding with the Audit Committee Defendants to violate GAAP and Section 162(m);

    c.     colluding with the other Individual Defendants to produce and disseminate to Bed Bath & Beyond's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

78.     The Audit Committee Defendants breached their fiduciary duties by:

    a.     colluding with the Officer Defendants and Compensation Committee Defendants to backdate stock option grants;

    b.     colluding with the Officer Defendants and Compensation Committee Defendants to violate GAAP and Section 162(m);

    c.     colluding with the other Individual Defendants to produce and disseminate to Bed Bath & Beyond's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options.

79.    The Compensation Committee Defendants breached their fiduciary duties by:

    a.     colluding with the Officer Defendants and Audit Committee Defendants to backdate stock option grants;

    b.     colluding with the Officer Defendants and Audit Committee Defendants to violate GAAP and Section 162(m);

    c.     colluding with the other Individual Defendants to produce and disseminate to Bed Bath & Beyond's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with the other Individual Defendants to file false proxy statements and false Form 4 filings in order to conceal the improper backdating of stock options

80.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

81.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company was required to incur and loss of funds paid to the Company upon exercise of options.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

82.     Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

83.     As alleged herein the Individual Defendants owed and owe Bed Bath & Beyond fiduciary duties. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bed Bath & Beyond the highest obligations of fidelity, trust, loyalty and due care. Additionally, each Individual Defendant owed and owes Bed Bath & Beyond a duty to ensure that the Company operates in a diligent, fair, honest and equitable manner and complied with all applicable federal and state laws, rules and regulations.

84.     Each of the Individual Defendants knew, should have known, or recklessly disregarded that the Individual Defendants violated and breached their fiduciary duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

85.     Each of the Individual Defendants had actual or constructive knowledge that he or she had caused the Company to improperly report the financial condition and business prospects of Bed Bath & Beyond, and failed to correct the Company's publicly reported financial results. These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties the Company has suffered significant damages.

87.     As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

30

## SECOND CAUSE OF ACTION

### Violations of Section 10(b) and Rule 10b-5 of the
### Securities and Exchange Act against All Defendants

88.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

89.    Throughout the relevant period, Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to divert hundreds of millions of dollars to Defendants via improper option grants.

90.    Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bed Bath & Beyond not misleading.

91.    Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by Bed Bath & Beyond.

92.    Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants were among the senior management of

31

the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

93.      Each of the Defendants participated in a scheme to defraud with the purpose and effect of defrauding Bed Bath & Beyond.

94.      By virtue of the foregoing, Defendants have violated §10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b) (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

## THIRD CAUSE OF ACTION

### Violations of Section 14(a) of the Exchange Act
### against All Defendants

95.      Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.      Rule 14a-9 promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

97.      Bed Bath & Beyond's Proxy Statements for issued during 2001-2005 violated §14(a) and Rule 14a-9 because they omitted material facts, including the fact that Defendants were causing Bed Bath & Beyond to engage in an option backdating scheme, a fact which Defendants were aware of and participated in.

98.     In the exercise of reasonable care, Defendants should have known that the Proxy Statements were materially false and misleading.

99.     The misrepresentations and omissions in the Proxy Statements were material to Plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

100.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## FOURTH CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act against All Defendants

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    Defendants, by virtue of their positions with Bed Bath & Beyond and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Bed Bath & Beyond within the meaning of § 20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause Bed Bath & Beyond to engage in the illegal conduct and practices complained of herein.

## FIFTH CAUSE OF ACTION

### Accounting

103.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    At all relevant times, Defendants, as directors and/or officers of Bed Bath & Beyond, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

105.    In breach of their fiduciary duties owed to Bed Bath & Beyond and its shareholders, the Defendants caused Bed Bath & Beyond, among other things, to grant backdated stock options to themselves and/or certain other officers and directors of Bed Bath & Beyond.  By this wrongdoing, the Defendants breached their fiduciary duties owed to Bed Bath & Beyond and its shareholders.

106.    The Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to the Defendants.

107.    As a result of Defendants' misconduct, Bed Bath & Beyond has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised and sold.

108.    Plaintiff demands an accounting of all stock options grants made to Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to the Defendants, as well as the disposition of any proceeds received by the Defendants via sale or other exercise of backdated stock option grants received by the Defendants.

34

## SIXTH CAUSE OF ACTION

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

109.   Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

110.   At the time of the stock sales by the Insider Selling Defendants set forth herein, each Insider Selling Defendant knew or should have known of the illegal backdating scheme described above and sold Bed Bath & Beyond common stock on the basis of such information.

111.   The information described above was proprietary non-public information concerning Bed Bath & Beyond's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Defendants used for their own benefit each time they sold Bed Bath & Beyond's common stock during the relevant period.

112.   At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenue's were materially overstated.  The Insider Selling Defendants' sales of the Company's common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of good faith and loyalty.

113.   Because the Insider Selling Defendants' use of the Company's proprietary information for their personal gain constitutes a breach of the Insider Selling Defendant's fiduciary duties, Bed Bath & Beyond is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## SEVENTH CAUSE OF ACTION

### Against All Individual Defendants for Gross Mismanagement

114.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

115.    By their actions and/or inaction alleged herein, the Individual Defendants, directly, indirectly, knowingly, willfully and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of Bed Bath & Beyond in a manner consistent with the operations of a public company.

116.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Bed Bath & Beyond has sustained significant damages.

117.    As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Individual Defendants are liable to the Company.

## EIGHTH CAUSE OF ACTION

### Against All Individual Defendants for Abuse of Control

118.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

119.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Bed Bath & Beyond, for which they are legally responsible.

120.    As a result of the Individual's abuse of control Bed Bath & Beyond has sustained significant damages.

121.    As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## NINTH CAUSE OF ACTION

### Against All Individual Defendants for Unjust Enrichment and
### Waste of Corporate Assets

122.   Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

123.   As a result of the Individual Defendants' foregoing conduct, the Individual Defendants have caused Bed Bath & Beyond to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars in damages, as well as significant legal defense fees.

124.   As a result of the Individual Defendants' conduct described herein and as a result of the huge profits realized in illegal insider trading by the Insider Selling Defendants and the huge profits realized in bonuses and other compensation by the Individual Defendants, all of the Individual Defendants have been unjustly enriched and/or aided and abetted in the unjust enrichment of the other Individual Shareholders at the expense of Bed Bath & Beyond and its shareholders.

125.   The Individual Defendants should be required to disgorge the gains which they will obtain or have unjustly obtained at the expense of Bed Bath & Beyond and its shareholders.  A constructive trust for the benefit of Bed Bath & Beyond and its shareholders should be imposed upon those proceeds.

126.   As a direct and proximate result of the Individual Defendants' unjust enrichment and waste of corporate assets Bed Bath & Beyond has sustained significant damages.

127.   As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to Bed Bath & Beyond;

B.    Requiring the Individual Defendants to pay Bed Bath & Beyond the amounts by which the Company has been damaged by reason of the conduct complained herein;

C.    Requiring restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E.    Granting extraordinary equitable and/or injunctive relief as permitted by law or equity for the Defendants' breaches of fiduciary duties; and

F.    Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 16, 2006

Respectfully submitted,

*Pamela E Kulsrud*

**KIRBY McINERNEY & SQUIRE, LLP**
Pamela E. Kulsrud, Bar No. PEK 4310
830 Third Ave., 10th Floor
New York, NY 10022
Telephone: (212) 371-6600

38

**CAULEY BOWMAN CARNEY & WILLIAMS, PLLC**
J. Allen Carney
Darrin L. Williams
Marcus N. Bozeman
11311 Arcade Drive, Suite 200
Little Rock, Arkansas 72212
Telephone:  (501) 312-8500
Facsimile:   (501) 312-8505

Attorneys for Plaintiff

VERIFICATION

I, John Olaimey, hereby declare as follows:

1.     I am board member of Snowball Capital Appreciation Fund, LP. ("Snowball")

2.     I have read the foregoing complaint and know the contents thereof.  Based on the research and investigation by Cauley Bowman Carney & Williams, PLLC, Securities Counsel, for Snowball, I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

3.     Snowball has authorized Cauley Bowman Carney & Williams, PLLC to file this derivative action against certain officers and directors of Bed Bath & Beyond, Inc.

4.     I make this verification on behalf of Snowball, a shareholder now and during the relevant times of Bed Bath & Beyond, Inc..

Executed this __16th__ day of October, 2006 at Little Rock, Arkansas

JOHN OLAIMEY